UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARILYN SARTOR,

                Plaintiffs,                                CASE NO. 11-14173
                                                      HON. LAWRENCE P. ZATKOFF

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, WILLIAM STARR
and DEBBIE STARR,[1]

                Defendants.

_____/

OPINION AND ORDER

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on the 25th day of June, 2013

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

I.  INTRODUCTION

This matter is before the Court on Defendant State Farm Mutual Automobile Insurance

Company's ("State Farm") Motion for Summary Judgment (Docket #23). Plaintiff filed a response,

and the time for filing a reply has expired. The Court finds that the facts and legal arguments

pertinent to the motion are adequately presented in the parties' papers, and the decision process will

not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(f)(2), it is hereby

_____

[1]Plaintiff filed a "Suggestion of Death on the Record" with respect to Defendant Debbie Starr
(Docket #6) on December 14, 2011, and obtained a Clerk's Entry of Default against Defendant
William Starr on January 12, 2012 (Docket #10).

ORDERED that the motion be resolved on the briefs submitted by the parties, without this Court entertaining oral arguments. For the reasons that follow, State Farm's motion is GRANTED.

## II. BACKGROUND

### A.    The Accident

This combined first and third party no-fault benefits lawsuit arises out of a motor vehicle accident that occurred on June 24, 2009 in Ypsilanti, Michigan. On that date, a vehicle driven by Defendant William Starr ("Starr") sideswiped the van driven by Plaintiff, striking the front end of the driver's side of her vehicle. Starr was cited for failure to yield. At her deposition, Plaintiff testified that she suffered injuries to her shoulders, ankle and back as a result of the accident, all of which caused her to have difficulty moving and to experience considerable pain in her middle back down to her tailbone region.

### B.    Plaintiff's Medical History and Treatment Prior to the Accident

In December 2006, Plaintiff was working as a machine operator at a stamping company. While working, Plaintiff started to experience pain in her neck, shoulders, hands and fingers, with associated numbness. As a result, she was disabled from work and received worker's compensation benefits. In February 2007, Dr. Steven Harwood gave Plaintiff a steroid injection in her right wrist after she complained of pain in her right neck, upper back and arm, with a constant throbbing in both of her hands. A subsequent electromyogram ("EMG") test revealed that she suffered from bilateral carpal tunnel syndrome. Plaintiff was given a prescription for a cervical collar and physical therapy, and Dr. Harwood completely disabled Plaintiff from work until her return visit on March 30, 2007. At her return visit, Plaintiff continued to complain of left and right neck pain and numbness in both

hands.  On April 9, 2007, Dr. Harwood ordered an MRI of Plaintiff's cervical spine, an MRI that indicated moderate acquired spondylotic and congenital factors resulting in moderate canal stenosis, mild-moderate cervical facet hypertrophy, and mild discogenic degenerative changes.

On May 9, 2007, Plaintiff saw Dr. Geoffrey Thomas.  She complained of posterior cervical pain with some hand pain and numbness, stating that the pain began at work in 2006 and continued to get progressively worse.  Dr. Thomas diagnosed Plaintiff with spondylosis throughout the cervical spine, with congenital versus superimposed acquired stenosis due to posterior disk bulge and spur formation; it was most marked at C4-C5 level.  Dr. Thomas related her pain complaints to her diffuse cervical spondylosis.

Plaintiff underwent several surgical procedures thereafter.  On August 16, 2007, Plaintiff underwent a right carpal tunnel release operation, and she had a left carpal tunnel release operation a month later.  On December 3, 2007, Plaintiff underwent a cervical diskectomy and fusion at her C3-4 and C4-5 to treat her cervical stenosis.  On March 24, 2008, Dr. Harwood noted that Plaintiff had some minor improvement in her neck symptoms but was still having problems with her hands. Dr. Harwood prepared a return to work slip, effective for March 31, 2008, that restricted Plaintiff from: (1) lifting anything greater than 10 pounds, (2) doing any overhead work, (3) using her arms above shoulder level, and (4) doing any repetitive gripping or twisting motions with her hands.

On May 14, 2008, Plaintiff continued to complain of neck pain radiating into both of her arms, with numbness in her hands.  Dr. Harwood believed that her symptoms were coming primarily from her neck area (not her carpal tunnel problems), and he prescribed her three Vicodin Extra Strength pills per day for pain.  Plaintiff last treated with Dr. Harwood on August 20, 2008, at which time she still complained of tightness in her neck radiating down into her shoulders.  The work

restrictions prescribed by Dr. Harwood in March 2008 were continued at the August 2008 visit and
no documentation has been produced that such restrictions were ever removed.

## C.     Post-Accident Medical Conditions and Treatment

Plaintiff testified that she did not seek medical treatment for the injuries allegedly associated
with the accident until March 2011, nearly 21 months after the accident.  Plaintiff testified that she
did not see a doctor earlier because of economic, family and relocation issues and because she was
afraid a doctor would make her have another surgery.  In March 2011, Plaintiff was living in
Muskegon, Michigan, but she went to see Dr. Harwood in Ypsilanti because she had seen him before
and did not want to see anyone else for her neck pain.  Plaintiff told Dr. Harwood that she had been
experiencing left neck pain that began the day after the accident but did not seek treatment for the
pain due to personal issues and her relocation to a shelter in Muskegon, Michigan.  Dr. Harwood
found Plaintiff's history and physical to be consistent with mechanical neck pain and left cervical
radiculitis.  He prescribed a soft cervical collar and physical therapy and directed her to contact her
auto insurance company to see if they approved the treatment he found to be medically necessary.

On April 25, 2011, Plaintiff saw Dr. Jacob Canfield in Grand Rapids, Michigan.  At that
visit, she complained of neck pain, mid-back pain radiating into both shoulders, low back pain, and
numbness and tingling in her left arm and hand, and she attributed this pain to the impact from the
accident.  Dr. Canfield took an x-ray which showed decreased cervical curve, increased thoracic
curve, decreased lumbar curve, vertebral subluxations at C6-7, T3-5 and L3-5, and foraminal
encroachments at C3-C7.  Dr. Canfield recommended that Plaintiff participate in corrective
manipulations and treatment consisting of hot packs, mechanical traction, manual traction, and
massage. Dr. Canfield restricted Plaintiff from lifting anything over 10 pounds, twisting, prolonged

standing or sitting, and overhead reaching, and he referred Plaintiff for an MRI and EMG study. Plaintiff saw Dr. Canfield two or three times before she stopped because she could not afford to travel to see him and because she had housing issues.

Plaintiff was then referred by Dr. Harwood to Dr. Roman Franklyn in Muskegon, Michigan, due to Dr. Franklyn's proximity to where Plaintiff was living. On July 21, 2011, Plaintiff told Dr. Franklyn that she had back stiffness and hip pain that had been gradual since the accident but consistent for the two years thereafter. The medical records indicate that Plaintiff stated: "My back hurts. I've had spinal surgery in the past. My hands and my shoulders go numb. I need to be referred to a back specialist." Plaintiff also complained of mental problems, including headaches, insomnia and depression. Dr. Franklyn found tenderness and decreased range of motion to Plaintiff's neck and decreased range of motion and painful movements in her cervical spine. Plaintiff was ordered to participate in therapeutic exercise and manual therapy two times a week for a period of four weeks. Dr. Franklyn noted that Plaintiff was impaired from getting in and out of bed, driving, grooming, bathing and/or showering, dressing, household maintenance, and lifting, all of which were: (a) associated with pain, increased tenderness, decreased joint mobility, decreased flexibility, and decreased range of motion, and (b) consistent with chronic neck pain.

On August 4, 2011, Plaintiff underwent an Independent Medical Examination by Dr. David Estefan. Based on a review of Plaintiff's medical records and a physical examination, Dr. Estefan diagnosed Plaintiff with: (1) cervical spine segmental dysfunction with associated myofascial pain; (2) lumbar myofascial pain syndrome; and (3) cervical radiculopathy without obvious organic cause. Dr. Estefan did not believe Plaintiff's complaints were the result of the accident but rather from

work related tasks while employed in the food service department.  Dr. Estefan also did not believe any injuries Plaintiff suffered in the accident existed at the time of the examination.

On September 13, 2011, Dr. Franklyn ordered an x-ray of Plaintiff's cervical spine, which x-ray showed narrowing of the C5-C6 and C6-C7 discs, with osteophyte formation.  An x-ray of her lumbar spine showed narrowing of the L3-L4 disc with mild osteophyte formation.  An MRI of her cervical spine showed spinal canal stenosis at C5-C6 and C6-C7, and an MRI of her lumbar spine showed degenerative disease at L3-L4 and L4-L5, resulting in noncompressive bilateral neural foraminal narrowing.  On November 4, 2011, Plaintiff underwent an EMG, performed by Dr. Gary Gurden.  The test was normal with the exception of mild bilateral carpal tunnel syndrome in the upper extremities.  There was no evidence of cervical or lumbosacral radiculopathy.

Since the accident, Plaintiff states that she was not able to continue performing her job duties at the part-time food service job she held from August 2010 to March 2011 (Plaintiff was "taken off" the job by Dr. Canfield), resulting in little income and necessitating living in homeless shelters with her children.  Plaintiff also suffers from depression and has sought counseling for not being able to sleep.  Plaintiff states that her daughters have to help her with daily duties, including putting on her clothes, watching children, cooking, cleaning and getting in and out of the tub.

### III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

# IV.  ANALYSIS

State Farm argues that Plaintiff has extensive pre-existing conditions which caused the same or similar symptoms as the symptoms Plaintiff now attributes to being caused by the accident on June 24, 2009.  State Farm therefore contends that: (1) Plaintiff cannot establish that she suffered a "serious impairment of body function," as such term is defined and interpreted under Michigan law, as a result of the accident, and (2) State Farm is entitled to summary judgment on Plaintiff's claim for uninsured motorist benefits.

Under the Michigan no-fault insurance act, MCL § 500.3101 *et seq.*, a plaintiff may recover for non-economic damages if she "has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL § 500.3135(1).  A "serious impairment of body function" means "an objectively manifested impairment of an important body function that affects a person's general ability to lead his or her normal life." MCL § 500.3135(7).[2]  As the parties agree, there are three prongs required to establish a "serious impairment of body function:" (1) an objectively manifested impairment (observable or perceivable from actual symptoms and/or conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person's general ability to lead his or her normal life (influences some of the plaintiff's capacity to live in his or her normal manner of living). MCL § 500.3135(7); *McCormick v. Carrier*, 487 Mich. 180, 215 (2010).

The first step in interpreting MCL 500.3135 is to determine the proper role of a court in applying MCL 500.3135(1) and (7).  The Legislature addressed this issue in the amended MCL 500.3135(2)(a), which states in pertinent part:

---

[2]At the time the accident occurred (as well as at the time this case was filed), "serious impairment of body function" was defined at MCL § 500.3135(7).  The no-fault insurance act was amended, effective October 1, 2012, such that the term "serious impairment of body function" – while having the same definition – is now defined at MCL § 500.3135(5).

The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:

(i) There is no factual dispute concerning the nature and extent of the person's injuries.

(ii) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement.

Under the plain language of the statute, the threshold question whether the person has suffered a serious impairment of body function should be determined by the court as a matter of law as long as there is no factual dispute regarding "the nature and extent of the person's injuries" that is material to determining whether the threshold standards are met. If there is a material factual dispute regarding the nature and extent of the person's injuries, the court should not decide the issue as a matter of law.

In this case, there does not appear to be any dispute regarding the nature and extent of Plaintiff's condition, but there is a factual dispute concerning whether Plaintiff's condition is the result of the injuries, if any, Plaintiff suffered in the accident. Thus, the Court must determine whether or not such factual dispute is material to the determination of whether Plaintiff has suffered a serious impairment of body function as a result of the accident. *McCormick*, 487 Mich. at 193. For the reasons set forth below, the Court finds that the factual dispute is not material to the determination of whether Plaintiff "has suffered a serious impairment of a body function[.]" *Id*.

Based upon Plaintiff's testimony that she was injured in the accident, there is evidence upon which a trier of fact could determine that Plaintiff has "an objectively manifested impairment" of an important body function for the period following the accident.[3] As is reflected in the medical

---

[3]The Court notes, however, that there is much evidence that Plaintiff suffered no injuries whatsoever as a result of the accident–specifically, the fact that the police report indicates that there were no injuries reported at the accident scene and the fact that Plaintiff did not see a physician for her alleged injuries until approximately 21 months after the accident.

records of Dr. Harwood and Dr. Thomas, including tests that they ordered, Plaintiff has problems with her neck, back, shoulders and arms and, as a result, there is evidence that she: (a) is unable to sit or stand for long periods; (b) is impaired in her ability to walk, lift, bend, twist and sit; and (c) is not able to care for and participate in activities with her children. As such, the Court finds that there is evidence that, if believed, allows a trier of fact to find that Plaintiff can satisfy the first two prongs of "serious impairment of body function," *i.e.*, (1) an objectively manifested impairment (2) of an important body function.

With respect to the third prong of "serious impairment of body function," however, the Court finds that there is no evidence that Plaintiff's claimed impairment(s), even if present following the accident, "affect[ed] [her] general ability to lead ... her normal life." Rather, the evidence proffered by the parties demonstrates that Plaintiff's "general ability to lead ... her normal life" was essentially the same before and after the accident. "The plain language of the statute only requires that some of the person's *ability* to live in his or her normal manner of living has been affected, not that some of the person's normal manner of living has itself been affected." *McCormick*, 487 Mich. at 202 (emphasis in original). As described in detail above, Plaintiff suffered numerous problems and underwent several surgeries following the work-related injury(ies) she suffered in 2006. More specifically, after suffering the work-related injury in 2006, Plaintiff experienced – and was taken off work by Dr. Harwood due to – pain in her neck, shoulders, hands and fingers, with associated numbness in her hands. She had three surgeries related to those problems in 2007 and 2008, and she was taking three Vicodin Extra Strength per day for pain. In addition, she was on restriction from many normal work and life activities. In fact, at the time of the accident in 2009, Plaintiff still had not returned to work after being taken off the job at the stamping plant in 2006.

The evidence submitted to the Court, including Plaintiff's own testimony, reflects the uniformity of complaints, physical conditions and physical limitations Plaintiff experienced both before the accident and after the accident:

1.   The EMG tests from both 2007 and 2011 showed that Plaintiff suffered from bilateral carpal tunnel syndrome, but there was no indication of cervical or lumbosacral radiculopathy.

2.   The MRIs of Plaintiff from 2007 and 2011 were consistent, as they both showed spinal canal stenosis at C5-C6 and C6-C7, degenerative changes within the cervical vertebral column, a condition also seen on x-rays of Plaintiff's cervical and lumbar spine in September 2011.

3.   Plaintiff testified tht she stopped working at the stamping plant in 2006 "because of [physical problems with] my spine."

4.   When Plaintiff described activities that she could not do with her children after the accident, Plaintiff was asked whether she was doing those activities before the accident, even after the neck surgery she had in 2007 and she responded: "No, I didn't do that then.  But prior to that, I mean, I should have been able-after my spine surgery, I should have been able to do all the things I used to do.  That's what I was told by Dr. Harwood and Dr. Thomas."

5.   From March 2008 forward, Plaintiff was on restriction to not: (a) lift anything greater than 10 pounds, (b) do overhead work, (c) use her arms above shoulder level, or (d) repetitively grip or twist with the hands.  Those restrictions were still in place at the time of the accident.  Plaintiff's restrictions following the accident (as identified in April 2011) were consistent with the pre-accident restrictions: she was restricted from lifting anything over 10 pounds, twisting, prolonged standing or sitting, and overhead reaching.

Likewise, as to specific activities that Plaintiff claimed she could not do following the accident (*e.g.*, put on a bra, do laundry or cook big meals), such activities were also activities she could not undertake following her work-related injury.  All of her complaints stem from problems with her back, neck and arms, and these are the same types of problems she complained of – and for which Dr. Harwood and Dr. Thomas treated her – prior to the accident.  In other words, the Court finds that

11

there is no evidence that Plaintiff's "ability to live in ... her normal manner of living has itself been affected." *McCormick*, 487 Mich. at 202 (emphasis omitted).

In opposing State Farm's summary judgment motion, Plaintiff does not and cannot distinguish her physical condition and limitations after the accident from her physical condition and limitations that existed prior to the accident. Instead, Plaintiff counters that "[c]ontrary to [State Farm]'s argument, ***none*** of these objective reports rule out the motor vehicle accident as a cause of these injuries." The fact that the objective reports do not rule out the accident as a cause of Plaintiff's injuries does not, however, help Plaintiff establish her burden of showing that the injuries were caused by the accident. More importantly, such reports fail to establish that the injuries and conditions that she suffered from after the accident are any different from the injuries and conditions that she suffered prior to the accident, such that Plaintiff's normal manner of living (at the time of the accident) was affected.

For the reasons discussed above, the Court concludes that Plaintiff has not met her burden of creating a genuine dispute of material fact that the injuries she allegedly suffered as a result of the accident affected her general ability to lead her normal life. Therefore, the Court: (1) cannot find that Plaintiff has suffered a "serious impairment of body function," and (2) must grant State Farm's motion for summary judgment.

## V.  MISCELLANEOUS

The Court is dismayed by the performance of both Plaintiff's counsel and Defendant's counsel as their performance relates to the status of Michigan law pertaining to the focal point of this case and Defendant's motion for summary judgment, *i.e.*, "serious impairment of body function."  First, Defendant's counsel filed a brief in support of its motion for summary judgment that cited, relied upon, and quoted extensively from the Michigan Supreme Court's decision in *Kreiner v. Fischer*, 471 Mich. 109 (2004).  Specifically, Defendant's counsel relied on the *Kreiner* court's three-step process to discern whether a plaintiff had met the requisite three-prongs under MCL §500.3135(7).  *Kreiner*, however, was expressly overturned by the Michigan Supreme Court in 2010 (two years prior to the time Defendant's counsel filed the motion for summary judgment) in a well-publicized decision – *McCormick v. Carrier*, *supra* – a case Defendant's counsel repeatedly cited in his brief.  In particular, the *McCormick* decision denounced and rejected the third step created by the *Kreiner* court, *i.e.*, the step related to determining if the impairment affects the plaintiff's general ability to lead his or her normal life (the key issue before this Court).  Defendant's counsel's reliance on clearly overturned law is inexplicable.  Second, and equally inexplicable, is the fact that Plaintiff's counsel filed a response to Defendant's motion for summary judgment, yet failed to contest Defendant's counsel's reliance on *Kreiner*, even though: (a) *Kreiner* was expressly overturned by the Michigan Supreme Court, and (b) Plaintiff's counsel heavily relied upon and cited *McCormick* in Plaintiff's response brief.

## VI.  CONCLUSION

Accordingly, and for the reasons set forth above, IT IS HEREBY ORDERED that State

Farm's Motion for Summary Judgment (Docket #23) is GRANTED.  IT IS FURTHER ORDERED

that Plaintiff shall advise the Court, in writing within 14 days of the date of this Opinion and Order,

if and how Plaintiff intends to proceed with her cause of action *vis a vis* Defendant William Starr

and Defendant Debbie Starr.

      IT IS SO ORDERED.


                           S/Lawrence P. Zatkoff
                           LAWRENCE P. ZATKOFF
                           UNITED STATES DISTRICT JUDGE

Dated: June 25, 2013